**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ISRAEL RUIZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-02750 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| LATONYA WILLIAMS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Israel Ruiz ("Plaintiff") brings this action against Defendants Marcus Hardy, Christopher Whitfield, Dillard Eggemeyer, Richard Harrington, Randy Pfister, Marvin Reed, and Louise Shicker (the "IDOC Defendants") and Latonya Williams, Parthasarathi Ghosh, M.D., Imhotep Carter, M.D., Andrew Tilden, M.D., Riliwan Ojelade, Samuel Nwaobasi, M.D., Robert Shearing, M.D., Fe Fuentez, M.D., Ronald Schaefer, M.D., and Wexford Health Sources, Inc. ("Wexford") (collectively, the "Wexford Defendants") for deliberate indifference arising out of their alleged failure to provide him with treatment for his abdominal pain and irritable bowel syndrome ("IBS") symptoms. This matter is before the Court on the Wexford Defendants' motion for summary judgment [139], the IDOC Defendants' motion for summary judgment [142], and Plaintiff's motion for leave to file a surreply in opposition to Defendants' motions for summary judgment [177]. For the reasons explained below, Plaintiff's motion for leave to file a surreply [177] is granted; the Court has taken into consideration the attached surreply and Defendants' responses to the motion to file a surreply. See [177-1], [180], [181]. The Wexford Defendants' motion for summary judgment [139] is granted in part and denied in part. Summary judgment is granted in favor of Dr. Ghosh, Dr. Fuentez, and Wexford and against Plaintiff on

Plaintiff's Eighth Amendment deliberate indifference and First Amendment retaliation claims, and for Dr. Schaefer and against Plaintiff on Plaintiff's First Amendment retaliation claim. Summary judgment is denied as to the Eighth Amendment and First Amendment claims against Williams, Dr. Carter, Dr. Tilden, Ojelade, Dr. Nwaobasi, and Dr. Shearing, and as to the Eighth Amendment claim against Dr. Schaefer. The IDOC Defendants' motion for summary judgment [142] is granted in part and denied in part. Summary judgment is granted in favor of all IDOC Defendants and against Plaintiff on Plaintiff's First Amendment claim and in favor of Hardy, Whitfield, and Harrington and against Plaintiff on Plaintiff's Eighth Amendment claim. Summary judgment is denied as to the Eighth Amendment claim against Defendants Pfister and Reed. This case is set for status hearing on April 19, 2018 at 9:30 a.m.

## I.    Background

The Court takes the relevant facts from the parties' Local Rule 56.1 statements and exhibits thereto, [141], [142-1], [158], [159], [160], [166], [173], [175], [176], and Plaintiff's affidavit [161] and exhibits thereto. The following facts are undisputed except where a dispute is noted.

Plaintiff is an inmate in the custody of IDOC. He currently resides at Hill Correctional Center. Plaintiff testified that on February 24, 2010, while incarcerated at Stateville Correctional Center ("Stateville"), he felt what he describes as a "gastric eruption" in his lower right abdomen and groin area and began experiencing overwhelming gas, constipation, rectal bleeding, and severe abdominal pain. This lawsuit arises out of Defendants' alleged deliberate indifference to Plaintiff's serious medical needs at Stateville and later when he was transferred to Pontiac Correctional Center ("Pontiac") and then to Menard Correctional Center ("Menard"). Plaintiff brings the lawsuit against his medical providers (the Wexford Defendants) and IDOC employees

and officials (the IDOC Defendants) at all three facilities, as well as against IDOC's medical director, Dr. Shicker.

Wexford is a medical services provider contracted by IDOC to provide healthcare to prisoners within IDOC correctional facilities. It is undisputed that "[c]opays are an IDOC policy," but disputed whether Wexford is involved in charging inmates co-pays. [158] at 33. The Wexford Defendants contend generally that when providing treatment to IDOC inmates, they use their own independent medical judgment, based upon their experience, education and training. Plaintiff disputes this, asserting instead (as detailed below) that the Wexford Defendants ignored his complaints and their own knowledge that he could have IBS and failed to treat him appropriately because he had previously sued Wexford and its employees.

### A.    Stateville

Plaintiff was incarcerated at Stateville for twelve years, until July 16, 2012. Defendant Marcus Hardy ("Hardy") was the Warden of Stateville between December 1, 2009 and December 31, 2012. Hardy's clerks opened and sorted his mail. Hardy would not necessarily see every letter sent to him by an inmate. Hardy had several assistant wardens and one administrative support staff member who were designated to review emergency grievances. Hardy did not train these employees on these tasks. Hardy testified that he does not "intervene in inmate[s'] [medical] care." [142-6] at 16. However, he also testified that he or his designee would call the health care unit administrator if a grievance was deemed an emergency and would "want to know from our standpoint that [the inmate] was seen and that there was an assessment done." *Id*. at 19. Defendant Christopher Whitfield ("Whitfield") was a correctional officer at Stateville between 2003 and April 2015.

In 2010 and 2011, Defendant Parthasarathi Ghosh, M.D. ("Dr. Ghosh") was the site medical director of Stateville. Among other duties, Dr. Ghosh supervised the medical staff at Stateville, made rounds visiting patients in the infirmary, and referred patients for specialized consultations. During the same time at Stateville, Defendant Imhotep Carter, M.D. ("Dr. Carter") was the site medical director; Defendant Ronald Schaefer, M.D. ("Dr. Schaefer") was a staff physician; and Defendant Latonya Williams ("Williams") was a physician's assistant. Williams saw inmates who signed up for sick call appointments and provided annual physical examinations.

As described above, on February 24, 2010, Plaintiff felt a gastric eruption in his abdomen followed by immediate pain, overwhelming gas, constipation, and an urge to use the restroom. Plaintiff was seen and evaluated by Williams the next day, February 25, 2010. She took a stool sample. Plaintiff does not recall if she provided any other treatment.

Williams saw Plaintiff again at sick call on March 10, 2010. Plaintiff's complaints of abdominal pain, overwhelming gas and constipation remained unchanged. Williams prescribed FiberCon laxatives to treat Plaintiff's complaints of constipation. According to Plaintiff, he told Williams that the laxatives were making his abdominal pain worse, which prevented him from sleeping. Plaintiff denies that Williams performed a physical exam or advised him to stop eating soy.

Plaintiff states that he wrote Williams letters on April 29, 2010 and May 19, 2010 requesting test results and medical attention for his stomach pain. The Wexford Defendants dispute that Williams received any correspondence from Plaintiff at any time. Plaintiff also contends that he sent the health care unit at Stateville a letter on July 2, 2010 addressed to Dr.

Ghosh reporting that he was experiencing stomach pain, gas, and constipation. The Wexford Defendants do not admit to receiving any correspondence from Plaintiff at any time.

On August 3, 2010, Plaintiff sent Hardy's office an emergency grievance. On August 11, 2010, Hardy reviewed Plaintiff's grievance and determined that it was an emergency. Hardy testified that he found Plaintiff's grievance to be an emergency because Plaintiff "said he felt something burst," "it seemed like it was repetitive and seemed to be being addressed by medication only," and he wanted to "make sure that it was addressed by the medical director." [142-6] at 28-29. Hardy testified that he did not recall "specifically" what action he took, but that he would have "[r]eferred to it to whoever was the designee to follow up at the time" and "that person would have given it to the counselor assigned to that caseload." *Id*. at 29.

Plaintiff was provided with a sick pass on August 11, 2010, but denies seeing a doctor on that date. Instead, Williams saw Plaintiff again on that date. It is undisputed that Plaintiff complained of gas, but Plaintiff contends that he also complained of abdominal pain and constipation and that the laxatives were making his abdominal pain worse. Williams testified that she referred Plaintiff to a physician to get a second opinion and recommended that he discontinue offense foods. However, Plaintiff denies that Williams sent him to a physician to address his abdominal issues.

Plaintiff maintains that he sent a letter to Hardy on August 26, 2010 explaining that he had still not seen a doctor. Hardy does not admit to receiving or reviewing Plaintiff's communications. Hardy testified, however, that if he received a letter from an inmate whose grievance he had previously deemed to be an emergency, he had the ability to "make sure he's seen." [142-6] at 32. Plaintiff believes that he also spoke to Hardy in person about his medical

concerns; however, he did not recall how many conversations he had with Hardy or when those conversations took place.

Plaintiff was provided with another sick call pass on September 17, 2010, but denies seeing a doctor on that date, either. That day, Plaintiff filed another emergency grievance. The IDOC Defendants admit that the grievance was received, but dispute that Hardy ever saw or was aware of the grievance, which was signed by his designee. Hardy testified that the grievance was reviewed by his designee on September 28, 2010 and determined not to be an emergency because it appeared that Plaintiff had been seen by a doctor on September 20 (as discussed in the next paragraph). When the Warden's office determined that a grievance was not an emergency, the grievance was given back to the grievance office to be returned to the inmate, who would then have to refile it through the normal grievance process.

Plaintiff asserts that he saw Dr. Schaefer on September 20, 2010 when he had a health care pass to see another doctor at Stateville's seizure clinic. Plaintiff testified that he told Dr. Shaffer all of his symptoms, including pain, constipation, and overwhelming gas, but Dr. Schaefer "flat out denied medical treatment" and told him, "I already seen two people in the ER today for other things other than what they came for" and that "[i]f something burst in your stomach you would be dead already." [141-1] at 14. According to Plaintiff, he told Schaefer: "Look, if I have some illness that could be treated and caught sooner, and because you're refusing treatment, I have to continue to suffer, I told him I would sue him for the total disregard of my pain and suffering, and he said—he shrugged his shoulders and he said: Go ahead and sue; and he walked away." *Id*. at 15. This is the only time that Plaintiff saw Dr. Schaefer.

On September 21, 2010, Plaintiff filed another emergency grievance. The IDOC Defendants admit that the grievance was received, but dispute that Hardy ever saw or was aware

of the grievance, which was signed by his designee. Hardy testified that the grievance was reviewed by his designee on September 28, 2010 (the same day the September 17 grievance was reviewed) and deemed not to be an emergency because it appeared from the face of the grievance that Plaintiff had been seen by a doctor on September 20.

On November 3, 2010, Plaintiff filed another emergency grievance. The grievance was reviewed by Hardy's designee and deemed not to be an emergency. In all, Plaintiff testified that he sent at least ten grievances to the Warden's office about his abdominal pain and symptoms. The last nine were reviewed and signed by Hardy's designee.

Plaintiff saw Williams again in March 2011. Plaintiff again complained of abdominal pain, gas, and constipation. Plaintiff testified that he told Williams that the laxatives were not helping his pain, but that Williams told Plaintiff to stop writing her, that she didn't know what was wrong with him, and that the only person who could help was Jesus. Plaintiff further testified that Williams saw in his file a subpoena for documents from Plaintiff's previous lawsuit (a deliberate indifference suit titled *Ruiz v. Tilden* concerning medical treatment of his seizure disorder, see [141-1] at 18) and told him that she knew he wanted to sue her and that he should "[g]o ahead" and write a grievance about the visit. [158] at 10. According to Plaintiff, Williams did not examine him, provide any medical treatment, or refer him to the medical director.

Plaintiff contends that on September 22, 2011, Whitfield gave Plaintiff a pass to Stateville's Health Care Unit ("HCU"). Plaintiff maintains that on that same day, he twice noticed Whitfield walking near his cell and shouted to Whitfield to allow him to visit the HCU, but both times Whitfield walked away and did not respond to Plaintiff. Whitfield testified that he did not recall Plaintiff or any interactions with him on September 22, 2011. Whitfield also

testified that he has never seen any medical passes permitting Plaintiff to go to the HCU on September 22, 2011.

In December 2011, Plaintiff saw Dr. Carter. Dr. Carter's examination revealed positive bowel sounds, a soft, non-tender abdomen, no blood in the stools, but small external hemorrhoids. Dr. Carter prescribed laxatives and medicine for hemorrhoids. Plaintiff testified that Dr. Carter ignored his complaints that he was experiencing abdominal pain, overwhelming gas and constipation and that he kept being given laxatives even though they were not helping his pain. On January 13, 2012, Plaintiff saw Dr. Carter again. Plaintiff denies that Dr. Carter performed an abdominal exam at that visit. Dr. Carter prescribed Lactulose, another laxative. Plaintiff denies that the Lactulose provided him with any relief and asserts that it increased his abdominal pain.

Plaintiff next saw Dr. Carter on March 13, 2012. Plaintiff denies that Dr. Carter performed an abdominal exam at this visit. According to Plaintiff, Dr. Carter again ignored his complaints of abdominal pain, overwhelming gas, and constipation and failed to address his pain. Dr. Carter made a notation in Plaintiff's medical records that Plaintiff had somatization disorder and placed "IBS versus chronic constipation on Plaintiff's problems list." [158] at 13. Somatization disorder indicates that there are no physical or objective findings that correlate with a patient's subjective complaints. Plaintiff denies that he was actually diagnosed with a somatization disorder. Plaintiff also testified that when Dr. Carter was reviewing his medical file, "he came across the subpoena for documents that was in there, and he immediately got mad, and he turned to me and he said: You need to learn how to live in pain for the rest—you might be in pain for the rest of your life, or something like that." [142-4] at 51-52.

Plaintiff saw Williams again on July 11, 2012. It is undisputed that Plaintiff complained of gas and constipation, but Plaintiff contends that he also complained of abdominal pain. The Wexford Defendants contend, and Plaintiff denies, that Williams referred Plaintiff to the medical director. Williams testified that she would refer a patient to the medical director by writing a note in the chart for the nurse or medical technician to implement, but Plaintiff denies that this is IDOC procedure.

Dr. Ghosh never saw Plaintiff concerning his gastrointestinal issues. See [158] at 16. However, Dr. Ghosh saw Plaintiff about earlier medical problems and was deposed in Plaintiff's prior lawsuit while he was still working at Stateville. Plaintiff asserts that he wrote numerous letters to Dr. Ghosh, reporting that he experienced a "gastric eruption" in his stomach and was experiencing severe abdominal pain, bloating, and rectal bleeding and was not receiving treatment. The record contains a copy of one letter that Plaintiff purportedly sent to Dr. Ghosh on July 1, 2010, which states that he is having "stomach pains, gas and problems using the bathroom" and is "getting no help." [161-3]. The Wexford Defendants dispute that Dr. Ghosh ever saw or received any letters from Plaintiff. See [173] at 6, 12-13.

**B.    Pontiac**

Plaintiff was transferred to Pontiac on July 16, 2012 and remained there until January 30, 2013. Defendant Randy Pfister ("Pfister") was the Warden of Pontiac between May 2011 and November 2014. Defendant Marvin Reed ("Reed") was the Assistant Warden of Programs at Pontiac between the Spring of 2010 and July 2013. Defendant Riliwan Ojelade ("Ojelade") was a physician's assistant at Pontiac while Plaintiff was incarcerated there. Ojelade's responsibilities included evaluating, diagnosing, and treating patients. During the same time,

Defendant Andrew Tilden, M.D. ("Dr. Tilden") was a medical doctor at Pontiac. His responsibilities included treating patients, among other things.

Dr. Tilden saw Plaintiff and performed a prostate exam on August 29, 2012. According to Plaintiff, he told Dr. Tilden that for over two years he had been suffering from extreme abdominal and groin pain and had overwhelming gas in his digestive tract, pain in his lower back, and a lump on his rectum that bleeds. According to Plaintiff, he also told Dr. Tilden that his symptoms were preventing him from sleeping and that the constipation medicine he had been prescribed was actually increasing his pain. According to Plaintiff, Dr. Tilden reviewed Plaintiff's medical file and saw a subpoena that was in the file, and told Plaintiff "I knew you were full of shit" and laughed. [158] at 17; see also [161] at 6 (Plaintiff's affidavit). Dr. Tilden proscribed Plaintiff Dulcolax, a laxative, to be taken three days a week for three months.

Plaintiff testified that his first exchange with Reed took place in the cellhouse on September 12, 2012, when Plaintiff stopped Reed while he was passing by on the gallery. Plaintiff asserts that he told Reed his symptoms and that he was in pain and not being providing treatment and asked him for help. Plaintiff testified that Reed took his name and ID number down and told Plaintiff "I'll see." [142-4] at 97.

Ojelade saw Plaintiff on September 13, 2012. Plaintiff complained of abdominal pain and constipation. Plaintiff also maintains that he explained that he kept being given laxatives even though they weren't helping his pain. The Wexford Defendants maintain, but Plaintiff denies, that Ojelade examined Plaintiff's abdomen and found it to be normal and diagnosed Plaintiff with hypochondriasis. Plaintiff maintains that Ojelade told him that he would not get any help other than a pill for constipation because "the state of Illinois is broke" and therefore any MRI or lower GI testing at an outside hospital was out of the question. [158] at 18. The

Wexford Defendants assert, and Plaintiff denies, that Plaintiff refused the medications that Ojelade sought to order. In his affidavit, Plaintiff also states that during the September 13 visit, he "saw Ojelade review the subpoena in [his] medical file." [161] at 6.

Plaintiff testified that he sent a letter to Reed on October 11, 2012. Plaintiff asserts that the following day, Reed came by his cell and Plaintiff told Reed all his symptoms and that he was in severe pain and that the laxatives he'd been prescribed did not help the pain. See [142-4] at 98-99. Plaintiff testified that Reed told him that he would be put in for treatment on an emergency basis.

Dr. Tilden saw Plaintiff on October 14, 2012 in Pontiac's infirmary. Plaintiff explained all of his symptoms to Dr. Tilden and told him that he was in severe pain but not getting any medication to help. Plaintiff also told Dr. Tilden that he kept being given laxatives, which were not treating his pain. Dr. Tilden performed a short examination of Plaintiff's abdomen and prescribed Plaintiff Milk of Magnesia, another laxative. Dr. Tilden said that he was going to retrieve Plaintiff's medical file but did not return until the next morning, when he informed Plaintiff that he was discharged from the infirmary. Defendants maintain, and Plaintiff denies, that Dr. Tilden continued Plaintiff's Dulcolax tablets and added FiberLax to be taken each morning for three months, but Plaintiff refused medication. The Wexford Defendants further assert, and Plaintiff denies, that Plaintiff was also referred for a psychological evaluation for anxiety.

Plaintiff testified that he sent Reed another letter regarding his medical care on October 18, 2012, explaining that he had not been provided treatment for his pain when he was admitted to the infirmary. Plaintiff testified that he received no response to this letter. Reed testified that he did not recall receiving the letter.

Plaintiff testified that he sent a grievance to Pfister on December 3, 2012, and subsequently sent Pfister two more copies of the same grievance, but received no response. Plaintiff testified that he also sent other grievances to Pfister, which were denied without explanation. See [142-4] at 112.

Defendant Pfister designated signatory authority to certain Pontiac employees by authorizing other individuals to sign his name on his behalf. Defendant Pfister testified that he did not recall receiving Plaintiff's grievances. See [142-8] at 18-19. Plaintiff admits that he does not know whether Pfister performed any follow up on his medical care during Plaintiff's time at Pontiac.

Plaintiff testified that he spoke to Reed again on January 1, 2013. According to Plaintiff, he explained all his symptoms to Reed and told him he was not receiving any treatment for his pain, but Reed told him that he was about to be transferred to another facility and would get treatment there. See [142-4] at 101; [159] at 12. Plaintiff admits that he does not know whether Reed followed up on his medical care after January 1, 2013. Plaintiff testified that he had one final encounter with Reed on January 10, 2013, when Reed and Pfister were walking by and he told them he was experiencing severe abdominal pain. [159] at 13; see also [142-4] at 105. According to Plaintiff, Pfister yelled at him that he [would] get to the grievances when he got to them, and Reed walked away. See *id.* at 105-106.

### C.    Menard

Plaintiff was transferred to Menard on January 30, 2013. Defendant Richard Harrington ("Harrington") was the Warden at Menard beginning in 2013. Defendant Robert Shearing, M.D. ("Dr. Shearing") was the medical director and Defendants Samuel Nwaobasi, M.D. ("Dr. Nwaobasi") and  Defendant Fe Fuentez, M.D. ("Dr. Fuentez") were staff physicians at Menard

during the time period at issue in Plaintiff's complaint. Defendant Dillard Eggemeyer ("Eggemeyer") was a correctional nurse working at Menard. Eggemeyer would have seen an inmate at his cell if the inmate turned in a note to see a doctor, or if a correctional officer determined on his own that the inmate needed to be seen by a medical professional. Eggemeyer testified that IDOC's treatment protocols at Menard define when nurses could dispense medication, and that the protocol for indigestion and heartburn did not allow for nurses to dispense pain medication. See [142-2] at 8. Plaintiff argues that the Wexford protocols did not prohibit Eggemeyer from prescribing Plaintiff pain medication. [177] at 11; see also [159] at 15 (denying that the protocols "explicitly state that nurses are prohibited from dispensing pain medication"). Looking at the protocols themselves, the "Nursing Intervention" set forth for "Indigestion/Heartburn" is "Maalox or Mylanta" and "contact provider for possible order for Zantac" (an antacid). [163] at 68. The "Nursing Intervention for "Stomach Ache (Abdominal Pain)" is "Maalox/Mylanta" for upset stomach and "Milk of Magnesia" for constipation. *Id.* at 85.

Dr. Nwaobasi first saw Plaintiff on April 20, 2013. Plaintiff complained of abdominal pain. Plaintiff contends that he told Dr. Nwaobasi that he was experiencing abdominal pain, overwhelming gas and constipation, and explained that he kept being given laxatives even though they weren't helping his pain. According to Plaintiff, when Dr. Nwaobasi read Plaintiff's medical file and came across the subpoena from Plaintiff's prior lawsuit, his attitude immediately changed and he started addressing Plaintiff in a hostile tone. According to Plaintiff, Dr. Nwaobasi told him that his symptoms were "all in [his] head" and indicated with his finger that Plaintiff was crazy. [158] at 21. The parties agree that Dr. Nwaobasi prescribed Tylenol to

Plaintiff. However, Plaintiff contends that Dr. Nwaobasi did nothing else to address his condition or pain, and denies that Dr. Nwaobasi advised him to increase his fluid intake.

Plaintiff maintains that in March or April 2013, he saw Harrington walking down his gallery and stopped Harrington to tell him that he was in extreme pain. According to Plaintiff, Harrington took down Plaintiff's name and ID number and said he would look into the issue. Harrington testified that he had no recollection that this incident took place. Plaintiff also asserts that he sent an unknown number of letters to Harrington while at Menard, but received no responses. Plaintiff admits that he has no indication whether Harrington ever received his letters. Plaintiff further asserts that he sent multiple grievances to Harrington, including grievances submitted on March 12, April 18, April 21, and June 6, 2013.

Plaintiff asserts that on May 31, 2013, he had a conversation with Eggemeyer. Plaintiff testified that he told Eggemeyer about all his symptoms and that he was getting laxatives but they weren't treating his pain. See [142-4] at 116. Eggemeyer took Plaintiff's temperature and blood pressure. Plaintiff testified that Eggemeyer also gave him "chewing tablets" for acid reflux but acknowledged that they would not treat pain. *Id*. According to Plaintiff, "Eggemeyer asked [him] to sign a $5.00 money voucher in order to see Dr. Shearing," but Plaintiff "told … Eggemeyer that he did not want to pay to see Dr. Shearing because the last time he saw Dr. Shearing he was thrown out of his office without any treatment for the pain." [159] at 17. Plaintiff had no additional interactions with Eggemeyer while at Menard.

Dr. Nwaobasi saw Plaintiff again on June 19, 2013. Dr. Nwaobasi testified that he performed a rectal exam, which was normal. Plaintiff cannot recall whether there was a rectal exam. Plaintiff contends that Dr. Nwaobasi ignored his complaints that he was experiencing

abdominal pain and overwhelming gas and constipation and that he kept being given laxatives even though they were not helping his pain.

Dr. Nwaobasi next saw Plaintiff on July 24, 2013 for his complaints of abdominal pain. Dr. Nwaobasi testified that he could find no objective explanation for Plaintiff's complaints and that he diagnosed Plaintiff with hypochondria based on the fact he could not find anything to corroborate Plaintiff's complaints. Plaintiff denies that he was ever given a formal diagnosis of hypochondria. According to Plaintiff, Dr. Nwaobasi again refused to do anything to address his complaints of abdominal pain, overwhelming gas and constipation and told Plaintiff to stop requesting to see him.

Dr. Shearing saw Plaintiff on May 15, 2013 for complaints of abdominal pain. Prior to seeing Dr. Shearing, Plaintiff had various diagnostic tests done and each test came back negative. The Wexford Defendants contend that Plaintiff had a negative physical examination and reported normal bowel movements to Dr. Shearing. Plaintiff denies reporting normal bowel movements. According to Plaintiff, when he arrived at his appointment with Dr. Shearing his medical file was lying open and Plaintiff could see the subpoena for documents from his previous lawsuit. Plaintiff also maintains that, in response to his complaints of pain, gas, and constipation, Dr. Shearing told him that he could not do anything for him and that he could keep writing letters and grievances. Plaintiff maintains that Dr. Shearing did not physically examine him and told him to get out of his office.

On November 20, 2013, Plaintiff saw Dr. Fuentez for treatment of a skin condition. Plaintiff told Dr. Fuentez about his abdominal pain and symptoms. Dr. Fuentez told Plaintiff that he would have to put in for a sick call in order to be treated for his abdominal pain.

Plaintiff submitted another grievance to Harrington on December 12, 2013. Plaintiff testified that on December 17, 2013, Harrington "stated that my condition was an emergency, and he sent me back to Dr. Fuentez to be treated." [159] at 18. Dr. Fuentez saw Plaintiff on that day. See [160] at 5. She did not treat Plaintiff but told him she would put him in to see a specialist. See *id.* Two days later, Dr. Fuentez saw Plaintiff again. She ordered Bentyl, a type of antispasmodic medicine, to quiet muscular contractions of the intestinal tract. Dr. Fuentez never saw the grievances filed by Plaintiff and was never made aware of any grievances filed by Plaintiff against her while she was at Menard.

On January 9, 2014, Plaintiff saw Dr. Trost (who is not a defendant). Dr. Trost has been identified by both Plaintiff and the Wexford Defendants as an expert in this lawsuit. Dr. Trost thought that Plaintiff might have IBS and continued his prescription for Bentyl (or dicyclomine) and FiberCon tablets. Plaintiff reported that Bentyl relieved his symptoms.

### D. IDOC Medical Director Shicker

Defendant Shicker was the IDOC medical director between November 2009 and June 15, 2016. Shicker's responsibilities were to oversee healthcare services for the department, create and update policies and procedures and administrative directives related to health care, and troubleshoot any problems that arose. Shicker has never met Plaintiff, examined Plaintiff, or personally provided Plaintiff with any medical care.

Plaintiff states in his declaration that he sent letters to Shicker regarding his medical care on September 18, 2011, April 12, 2012, and July 9, 2013. In each letter, Plaintiff asserts, he stated he was experiencing extreme pain, gas, and rectal bleeding, told Shicker that none of the doctors at Menard were treating him, and asked for help. Plaintiff testified that Dr. Shicker sent carbon copies of his responses to Plaintiff's letters to Dr. Carter and Hardy.

Defendant Shicker responded to Plaintiff's September 18, 2011 letter in writing on September 22, 2011. He advised Plaintiff that he must go through the grievance process. Shicker also responded to Plaintiff's March 10, 2012 letter in writing on March 29, 2012. Shicker advised Plaintiff that "he has been evaluated multiple times, no significant abnormalities had been found. Healthcare found no red flags in your symptoms, and your lab tests have also been ok." [159] at 22. Shicker testified that it was his normal practice to "correspond or phone the providers and find out what has been done for this individual." [142-12] at 79.

On April 24, 2012, Shicker emailed Marna Ross, the regional nursing coordinator at Stateville. He requested that she review Plaintiff's treatment for "persistent abdominal symptoms." [159] at 22. Ross responded that day, explaining that Plaintiff's kidney, ureter, bladder x-ray, CMP blood test for electrolytes and liver function, and test for pancreatitis were all "within normal limits." *Id.* On May 2, 2012, Shicker emailed Dr. Carter and Stateville HCU administrator Royce Brown-Reed requesting an update on Plaintiff's health. Defendant Shicker received a response from Dr. Carter the same day describing Plaintiff's complaints and treatment.

Defendant Shicker made a third request for an update on Plaintiff's medical diagnosis and treatment. She testified that she assumed she made the request "because of the letters that [Plaintiff] ha[d] sent [her]." [142-12] at 92. Plaintiff's letters to Shicker and Shicker's responses were Plaintiff's only interactions with Shicker between 2010 and 2014.

**E.    IBS**

It is undisputed that IBS is a diagnosis of exclusion of other causes of abdominal symptoms and that cramping, bloating, and diarrhea are symptoms of IBS. The Wexford Defendants contend based on the testimony of Drs. Tilden, Carter, and Shearing that IBS

presents most frequently with diarrhea, but can present with constipation. They also contend based on the doctors' testimony that abdominal pain is difficult to treat and that laxatives are an appropriate way to resolve constipation. Plaintiff objects to the consideration of this testimony on summary judgment on the basis that Drs. Tilden, Carter and Shearing were deposed only concerning their personal knowledge of the events at issue in this lawsuit and were not disclosed and did not testify as expert witnesses.

Dr. Trost has been designated as an expert witness by both Plaintiff and the Wexford Defendants. Dr. Trost testified as follows concerning whether laxatives were an appropriate treatment for IBS:

> Q. Would you ever recommend a patient take laxatives if the[y] are suffering from IBS?
> …
> [A.]   I wouldn't see any role really for laxatives in the treatment of that, no.
> Q. … Why not?
> …
> [A.]   Laxatives, depending upon, there are different mechanisms of action of different laxatives, but the primary thing they do to produce desired effect is they stimulate the bowel to propulse, to move things through. They would take an otherwise abnormal bowel, which is deemed to be overactive or hyperactive, and stimulate it further, which, you know, just wouldn't be my approach to, to taking care of a problem like that[.]
> Q.       … Sounds like it could make it worse.
> …
> [A.]     I could see how it would exacerbate some of the symptoms.

**F.     Chronic Care Clinics**

IDOC provides chronic care clinics for inmates who suffer from certain chronic conditions. There are a number and variety of condition-specific chronic care clinics at IDOC facilities, as well as general medicine chronic care clinics. Stateville, Menard, and Pontiac did not have specific gastrointestinal chronic care clinics while Plaintiff was incarcerated at each of those facilities. Dr. Tilden testified that there is no gastrointestinal clinic on its own and instead

"it's part of the general medicine" clinic for IDOC as a whole.  [141-7] at 9.  He also testified that an inmate can be placed into a chronic care clinic at a physician's discretion.  See *id*. at 10-11.  According to Dr. Tilden, prior to 2015 patients in the chronic care clinics were seen every four months.  *Id*. at 11.

## II.      Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250.  Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322).  The non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III.    Analysis

In his governing amended complaint [11], Plaintiff alleges an Eighth Amendment deliberate indifference against the individual Wexford Defendants and the IDOC Defendants (Count I) and against Wexford (Count II), as well as a First Amendment retaliation claim against all of the individual Defendants (Count III).

"The Eighth Amendment's proscription against 'unnecessary and wanton infliction of pain' is violated when prison officials demonstrate 'deliberate indifference to serious medical needs' of prisoners—whether the indifference 'is manifested by prison doctors in response to prison needs or by prison guards in intentionally denying or delaying access to medical care.'" *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim contains both an objective and a subjective component. "[A] prisoner must first establish that his medical condition is 'objectively, sufficiently serious,' and second, that prison officials acted with a 'sufficiently culpable state of mind'—*i.e.*, that they both knew of and disregarded an excessive risk to inmate health." *Id.* at 562-63 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"To state a First Amendment claim for retaliation, a plaintiff must allege that '(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at

least a motivating factor in the defendants' decision to take the retaliatory action.'" *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). A prisoner's filing of lawsuits and grievances is protected by the First Amendment, see *Bridges*, 557 F.3d at 553, and "denial of medical treatment is a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity." *Perez*, 792 F.3d at 783 (citing *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)).

Defendants have moved for summary judgment on all of Plaintiff's Eighth Amendment and First Amendment claims. As to the Eighth Amendment claims, Defendants do not challenge (at least for purposes of summary judgment) that Plaintiff suffers from an objectively, sufficiently severe medical condition. Instead, they argue that they responded appropriately to Plaintiff's medical complaints. As to the First Amendment claim, Defendants argue that there is no evidence that their purported failure to obtain or provide medical care to Plaintiff was motivated by Plaintiff's earlier filing of a deliberate indifference lawsuit, *Ruiz v. Tilden*, against Wexford doctors who treated his seizure disorder. The Court will begin its analysis of the parties' arguments with the Wexford Defendants.

### A. The Wexford Defendants

The Wexford Defendants are all medical providers who treated (or allegedly failed to treat) Plaintiff for his complaints of severe abdominal pain and related symptoms. An inmate need not "show that he was literally ignored" in order to establish that he was treated with deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez*, 792 F.3d at 777. That said, the Seventh Circuit has "consistently held that neither a difference of

opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference." *Zaya v. Sood*, 836 F.3d 800, 8005 (7th Cir. 2016); see also *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017); *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 662–63 (7th Cir. 2016). Yet "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did, then summary judgment is improper and the claim should be submitted to a jury." *Whiting*, 839 F.3d at 662–63 (quoting *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (en banc)).

Of course, "it can be challenging to draw a line between an acceptable difference of opinion … and an action that reflects sub-minimal competence and crosses the threshold into deliberate indifference." *Petties*, 836 F.3d at 729. Examples of when the threshold may be crossed include "when a doctor refuses to take instructions from a specialist," "fails to follow an existing protocol," or "chooses an easier and less efficacious treatment without exercising professional judgment," or where there is "an inexplicable delay in treatment which serves no penological interest." *Id*. at 729-30 (internal citation and quotation marks omitted). Deliberate indifference may also be shown with "proof that the defendant's treatment decision departed … radically from 'accepted professional judgment, practice, or standards.'" *Whiting*, 839 F.3d at 663 (quoting *Petties*, 836 F.3d at 730); see also *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017).

Further, a medical professional may be found to have acted with deliberate indifference where he or she "persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730; see also *Whiting*, 839 F.3d at 663. Although "the cost of treatment is a factor in determining what constitutes adequate, minimum-level care, medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Petties*, 836 F.3d at 730.

"For example, if knowing a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment." *Id.*; see also, e.g., *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (material fact issue whether provision of only painkillers and ice to an inmate suffering from suspected fracture constituted deliberate indifference); *Greeno*, 414 F.3d at 655 (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference).

With these legal standards in mind, the Court turns its analysis to the individual Wexford Defendants.

### 1. Physician's Assistant Williams

Williams, a physician's assistant at Stateville, saw Plaintiff on five occasions. The Wexford Defendants argue that Williams is entitled to summary judgment because the evidence shows that she provided consistent and appropriate treatment to Plaintiff. They assert that at Plaintiff's first appointment with her, Williams ordered blood work and scheduled a follow-up appointment; at his second appointment (where he appeared to be in no acute distress) she physically examined him and prescribed a laxative for constipation; and at his third appointment five months later (where he complained only of gas), physically examined him and then referred him to the medical director for further work-up of his gas complaints. According to the Wexford Defendants, Williams wrote a note in Plaintiff's chart reflecting the referral, and a nurse or medical technician then would be responsible for the referral. Williams testified that this is IDOC's procedure for referring a patient to the medical director and that her responsibilities ended there.

If these facts were undisputed, then Williams would be entitled to summary judgment on Plaintiff's deliberate indifference claim. But the Wexford Defendants ignore a number of material factual disputes raised by Plaintiff's testimony and affidavit. Plaintiff denies that Williams ever physically examined him at any of his follow-up visits. Plaintiff also maintains that, at all of the follow-up visits, he told Williams that he was in pain and that the laxatives she had prescribed were making his pain worse. Further, Plaintiff disputes that Williams ever referred him the medical director—Dr. Ghosh, who testified that he never saw Plaintiff. While the Wexford Defendants contend that, as a matter of IDOC policy, Williams' only responsibility for a referral was to make a note in the patient's chart, the only evidence of this is Williams' testimony, which the factfinder would not be required to believe. In addition, the Wexford Defendants ignore Plaintiff's testimony that she told him in March 2011—after allegedly seeing his subpoena from an earlier lawsuit in his medical file—that she did not know what was wrong with him and to stop writing her. This evidence that Williams refused to examine or treat Plaintiff's abdominal pain (beyond prescribing laxatives that he reported made his pain worse), which the trier of fact may or may not credit, precludes summary judgment in Williams' favor.

Plaintiff's testimony concerning Williams viewing the subpoena in his file also precludes summary judgment on Plaintiff's First Amendment retaliation claim against Williams. Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder might conclude that Williams told Plaintiff in March 2011 that she could not do anything for him and to stop contacting her in retaliation for Plaintiff suing Wexford medical providers previously, which a trier of fact could infer Williams had learned by seeing a subpoena from Plaintiff in his medical file. The Wexford Defendants argue that Plaintiff's testimony cannot preclude summary judgment because the medical records that they produced do not contain a subpoena. But the

Wexford Defendants have not established that the subpoena was never in Plaintiff's medical file and it is up to the factfinder to evaluate the credibility of Plaintiff's testimony that he saw Williams (and other Wexford Defendants) looking at the subpoena during his medical appointments, and Williams' testimony denying that this occurred.

### 2.    Dr. Ghosh

Dr. Ghosh was the site medical director at Stateville for part of the relevant period. The Wexford Defendants argue that Dr. Ghosh is entitled to summary judgment because he never saw Plaintiff or rendered him any treatment, and therefore cannot be held personally responsible for the claimed deprivation of Plaintiff's Eighth Amendment rights. Plaintiff responds that he sent Dr. Ghosh multiple letters and grievances about his abdominal pain and symptoms, but did not receive any response from Dr. Ghosh, who as medical director had the power to ensure that Plaintiff was seen by a doctor at Stateville.

The Court concludes that Dr. Ghosh is entitled to summary judgment on Plaintiff's deliberate indifference claim. Plaintiff's affidavit attaches a single handwritten letter addressed to Dr. Ghosh, which Plaintiff marked "copy." [161-3]. But Plaintiff has identified no evidence that Dr. Ghosh received or reviewed that letter or any other correspondence that Plaintiff allegedly sent to him, and Dr. Ghosh denies receiving any. Instead, Dr. Ghosh testified that letters addressed to him automatically go the office of the health care administrator, and an individual there would review it. See [141-4] at 32. If he or she decided to bring the letter to him, then usually he would countersign it, put it in the inmate's medical record, and determine the appropriate course. *Id.* at 31-32. Plaintiff has not identified any letters or grievances countersigned by Dr. Ghosh. Under similar facts, the Seventh Circuit affirmed the grant of summary judgment for the head of a "prison system's medical hierarchy," Dr. Elyea, where the

plaintiff did "not produce[] evidence that Dr. Elyea was aware of [the plaintiff's] condition" from the letters he alleged sent. *Keller v. Elyea*, 496 Fed. Appx. 665, 667 (7th Cir. Nov. 21, 2012); see also *Karim v. Obaisi*, 2017 WL 4074017, at *3, 9 (N.D. Ill. Sept. 14, 2017) (granting summary judgment on deliberate indifference claim in favor of prison doctor who allegedly failed to respond to plaintiff's letter complaining of shortness of breath and chest pain, where the record—which showed that "[t]here was a policy in place whereby nurses screened such letters and would ask doctors questions about them if they determined that was necessary" and doctor did "not recall a nurse ever approaching him with regard to a grievance letter" from the plaintiff—"indicated that [the doctor] did not receive or read [the plaintiff's] letter"); *Sharif v. Carter*, 2017 WL 3421554, at *11–12 (N.D. Ill. Aug. 8, 2017) (granting summary judgment in favor of Stateville's health care unit administrator because it was not her practice to review letters sent by inmates, and she did not read the relevant letter, so she could not have had the knowledge required for a claim of deliberate indifference).

### 3.   Dr. Carter

Dr. Carter, a physician at Stateville, saw Plaintiff three times. The Wexford Defendants argue that Dr. Carter is entitled to summary judgment because the evidence shows that he provided complete and competent treatment each time that he examined Plaintiff. At the first visit, Dr. Carter prescribed fiber tablets for constipation and Anusol for external hemorrhoids. At the second exam, Dr. Carter prescribed another laxative, Laculose, for Plaintiff's continuing complaints of constipation. At the third exam, Dr. Carter concluded after an abdominal exam that Plaintiff may have somatization disorder, a diagnosis indicating that there are no physical or objective findings that correlate with a patient's subjective complaints.

The Court concludes that Dr. Carter is not entitled to summary judgment. The Wexford Defendants' argument ignores Plaintiff's testimony that at each of his three visits, he told Dr. Carter that he was experiencing abdominal pain and that laxatives were not providing relief but instead increasing his pain, yet Dr. Carter continued to prescribe laxatives. This evidence, if credited by the fact finder, would suggest that Dr. Carter "persist[ed] in a course of treatment known to be ineffective," which the Seventh Circuit recognizes can support a deliberate indifference claim. *Petties*, 836 F.3d at 730. Further, there is evidence that by the time of Plaintiff's last visit, Dr. Carter suspected that Plaintiff may have IBS, as he made a note of this in Plaintiff's chart, yet prescribed laxatives anyway. According to the parties' expert, Dr. Trost, laxatives are not an appropriate treatment for IBS and may exacerbate its symptoms. The Court therefore agrees with Plaintiff that "Defendant Carter's continued prescription of laxatives and failure to prescribe any form of treatment to address [Plaintiff's] pain, despite being aware that [Plaintiff] may have IBS, constitute sufficient facts to create a genuine dispute as to whether he was deliberately indifferent to [Plaintiff]'s serious medical condition." [168] at 15.

The Wexford Defendants' persistence in prescribing laxatives after Plaintiff repeatedly complained that they were making his pain worse distinguishes this case from another recent case involving a prisoner with IBS suing for deliberate indifference, *Proctor v. Sood*, 863 F.3d 563 (7th Cir. 2017). In that case, the evidence showed that prison doctors treated the plaintiff with "with antispasmodic drugs, antibiotics, a stool softener, fiber, and medications to relieve his cramping, all of which were adjusted in response to his complaints," and therefore the plaintiff could not show that the defendants' actions were such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the doctors did not base their decisions on their professional judgment. *Id*. at 568. In this case, by contrast, the trier of fact

could conclude that Dr. Carter continued to prescribe Plaintiff laxatives even after Plaintiff told him that they were making his pain worse, and that this treatment was not adjusted in response to Plaintiff's complaints. Ultimately, Plaintiff's pain was alleviated only when, more than a year and a half later, Dr. Fuentez prescribed Plaintiff an antispasmodic medicine.

Dr. Carter is not entitled to summary judgment on Plaintiff's first amendment retaliation claim, either. According to Plaintiff, Dr. Carter saw the subpoena in his medical file at his March 13, 2012 visit, became angry and told Plaintiff that he may have to live with pain for the rest of his life, and again prescribed laxatives even though Plaintiff told him that they were making the pain worse and suspected that Plaintiff had IBS—a condition that Dr. Trost testified is not appropriately treated with laxatives. Taking the facts in the light most favorable to Plaintiff, a juror could conclude that Dr. Carter withheld appropriate medical treatment in retaliation for Plaintiff's filing of an earlier lawsuit against Wexford's medical providers.

### 4.    Dr. Tilden

Dr. Tilden began treating Plaintiff when he was transferred to Pontiac and saw Plaintiff twice. The Wexford Defendants argue that Dr. Tilden is entitled to summary judgment because on those two occasions, he provided appropriate care for Plaintiff's subjective complaints. At the first visit, Plaintiff complained of constipation, and Dr. Tilden prescribed a course of laxatives. At the second appointment, Plaintiff had "similar complaints," but a normal abdominal examination, but was nonetheless admitted to the infirmary for closer monitoring. [140] at 9. Dr. Tilden then prescribed Milk of Magnesia (another laxative) and fiber tablets and added Motrin (a pain reliever) for Plaintiff's new complaints of back pain.

The Court concludes that Dr. Tilden is not entitled to summary judgment because there are a number of material factual disputes that the Wexford Defendants fail to acknowledge.

According to Plaintiff, he told Dr. Tilden at both of his visits that he was in pain and that laxatives were not treating his pain but were making it worse. Dr. Tilden nonetheless prescribed laxatives at both visits, at least arguably "persist[ing] in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730. Plaintiff also denies that Dr. Tilden ever provided him with a prescription for Motrin. Dr. Tilden is not entitled to summary judgment on the First Amendment retaliation claim, either. Plaintiff testified that at the first visit, Dr. Tilden also saw the subpoena in Plaintiff's file and joked that he was "full of shit," and then knowingly preceded with a course of ineffective treatment. [158] at 17.

### 5.    Physician's Assistant Ojelade

Ojelade, a physician's assistant, saw Plaintiff once when he was incarcerated at Pontiac. The Wexford Defendants argue that Ojelade is entitled to summary judgment because he appropriately addressed Plaintiff's complaints of abdominal pain and constipation by prescribing laxatives, which Plaintiff refused to take. Ojelade diagnosed Plaintiff with hypochondriasis based on his physical examination of Plaintiff, which was normal. Plaintiff responds that he told Ojelade that laxatives were making his pain worse, but Ojelade told him that he could only give him laxatives because the State of Illinois was broke. Plaintiff also points out that Ojelade also could have seen from Dr. Carter's notation that Plaintiff may have IBS, undermining his diagnosis of hypochondriasis.

The disputed evidence identified by Plaintiff suggests that Ojelade "persist[ed] in a course of treatment known to be ineffective" and precludes summary judgment on Plaintiff's deliberate indifference claim. *Petties*, 836 F.3d at 730. While "the cost of treatment is a factor in determining what constitutes adequate, minimum-level care," it is not a sufficient excuse to "resort to an easier course of treatment that [is] known [to be] ineffective." *Id*. Further, Ojelade

is not entitled to summary judgment on Plaintiff's First Amendment claim because Plaintiff stated in his affidavit that during the September 13 visit, he "saw Ojelade review the subpoena in [his] medical file," [161] at 6, which could support an inference that Ojelade persisted with a course of treatment that he knew was ineffective in retaliation for Plaintiff's prior lawsuit against Wexford medical providers.

### 6. Dr. Nwaobasi

Plaintiff saw Dr. Nwaobasi for his abdominal pain and symptoms in April, June and July 2013 while incarcerated at Menard. The Wexford Defendants argue that Dr. Nwaobasi is entitled to summary judgment because there is no genuine dispute that his care and treatment were appropriate. At the first visit, Dr. Nwaobasi thought Plaintiff's pain might be related to adhesions from a prior surgery and prescribed Tylenol and recommended that Plaintiff increase his fluid intake. He chose not to give Plaintiff Tylenol with codeine because that is a narcotic medication that can cause an increase in constipation. Plaintiff saw Dr. Nwaobasi in June 2013 for complaints of rectal bleeding. Dr. Nwaobasi's rectal examination was normal. The Wexford Defendants assert that Dr. Nwaobasi nonetheless placed Plaintiff on a course of pain medications on this date, but their LR 56.1 statement does not support this. See [158] at 22, ¶ 43. Plaintiff returned to Dr. Nwaobasi in July 2013 for complaints of abdominal pain. According to the Wexford Defendants, Dr. Nwaobasi performed a physical examination, but could not find any objective explanation for Plaintiff's complaints and therefore diagnosed Plaintiff with hypochondria. According to the Wexford Defendants, Dr. Nwaobasi did not prescribe new pain medications because the prescription from the June visit was still in effect.

Plaintiff responds that Dr. Nwaobasi is not entitled to summary judgment because Dr. Nwaobasi did not, in fact, examine Plaintiff at his first two visits and instead—after seeing the

subpoena in Plaintiff's chart and becoming angry—told him he was crazy and would have to live with the pain, even though Dr. Carter's note in his chart indicated that he may have IBS. According to Plaintiff, Dr. Nwaobasi's reliance upon notations in Plaintiff's medical chart instead of his own examination of Plaintiff and his resulting refusal to treat Plaintiff is sufficient to defeat Dr. Nwaobasi's claim for summary judgment.

Dr. Nwaobasi is somewhat different than the other Wexford Defendants because there is no indication that he continued prescribing laxatives despite Plaintiff's complaint that he made his abdominal pain worse, and it is agreed that at Plaintiff's first visit Dr. Nwaobasi prescribed Tylenol for Plaintiff's pain. Further, the only evidence concerning whether Dr. Nwaobasi examined Plaintiff at the first visit is that Dr. Nwaobasi performed a rectal exam; Plaintiff could not recall whether there was a rectal exam. However, it is disputed whether Dr. Nwaobasi continued with the pain medication at Plaintiff's subsequent visits. Further, it is disputed whether Dr. Nwaobasi "knew better" than to diagnose Plaintiff with hypochondria and allegedly offer no treatment, given Dr. Carter's note about potential IBS and Plaintiff's testimony that Dr. Nwaobasi became hostile to him after seeing the subpoena in Plaintiff's file and told Plaintiff to stop requesting to see him. *Petties*, 836 F.3d at 730-31. Given these factual disputes, the Court concludes that Dr. Nwaobasi is not entitled to summary judgment on Plaintiff's deliberate indifference or First Amendment retaliation claims.

### 7. Dr. Shearing

Dr. Shearing, the medical director at Menard, saw Plaintiff on May 15, 2013 for complaints of abdominal pain. The Wexford Defendants argue that Dr. Shearing is entitled to summary judgment because the evidence shows that Dr. Shearing performed a physical examination but, like all the other medical providers, found no objective findings to corroborate

Plaintiff's complaints and knew that Plaintiff's prior tests came back negative for a source of his complaints. The Wexford Defendants also maintain that Plaintiff reported normal bowel movements to Dr. Shearing and denied any other gastrointestinal complaints, such as nausea, vomiting, constipation or diarrhea. Therefore, they contend, Dr. Shearing did not think that any additional treatment was necessary.

The Wexford Defendants do not address several material factual disputes that preclude summary judgment. Plaintiff denies that Dr. Shearing ever physically examined him, and also contends that he told Dr. Shearing that he was still experiencing pain, gas, and constipation. Plaintiff also points out that Dr. Shearing's review of his file would have disclosed Dr. Carter's notation that Plaintiff may be suffering from IBS. Plaintiff also asserts that when he arrived at his appointment, his medical file was lying open with his subpoena from a prior lawsuit on top. Viewing the facts in the light most favorable to Plaintiff, a juror could conclude that Dr. Shearing observed the subpoena from Plaintiff's previous lawsuit and refused to provide medical treatment on that basis, despite Plaintiff's complaint of continuing symptoms and Dr. Carter's note concerning IBS. Therefore, Dr. Carter is not entitled to summary judgment on Plaintiff's Eighth Amendment or First Amendment retaliation claims.

### 8. Dr. Fuentez

The Wexford Defendants argue that Dr. Fuentez is entitled to summary judgment because she appropriately and successfully addressed Plaintiff's complaints of stomach pain on the one occasion when she saw him, by prescribing the antispasmodic medication Bentyl. Plaintiff responds that he actually saw Dr. Fuentez on three occasions, and she was deliberately indifferent until the third visit, when Harrington allegedly ordered her to actually provide treatment.

The Court concludes that Dr. Fuentez is entitled to summary judgment on Plaintiff's deliberate indifference claim. The evidence shows that at his first visit for an unrelated skin condition, Dr. Fuentez told Plaintiff that, per IDOC policy, he would need to put in for a sick call order if he wanted to see her for his stomach complaints. Dr. Fuentez did not refuse to treat Plaintiff; she instead told him the process to follow to be allowed to see her for his unrelated medical issue. Plaintiff was able to see Dr. Fuentez a few weeks later and she initially stated that she would put him in to see a specialist. The Court cannot conclude that this showed that Dr. Fuentez was indifferent, given Plaintiff's repeated complaints that his current treatment was not working. While Plaintiff did not ultimately see a specialist, that became unnecessary because Dr. Fuentez saw Plaintiff again two days later and prescribed the antispasmodic medication that Plaintiff admits finally alleviated his stomach pain. Further, there is no evidence that Dr. Fuentez knew about Plaintiff's previous lawsuit against Wexford doctors or about any grievances he filed against her. Therefore, Dr. Fuentez is also entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

### 9. Dr. Schaefer

Dr. Schaefer, a physician at Stateville, interacted with Plaintiff once while Plaintiff was participating in the facility's seizure clinic. The Wexford Defendants argue that Dr. Schaefer is entitled to summary judgment because Plaintiff cannot establish that Dr. Schaefer had any involvement whatsoever in Plaintiff's care and treatment. Plaintiff responds that at the seizure clinic he told Dr. Schaefer that he was experiencing severe abdominal pain and that the medications he was being given were not effective, but Dr. Schaefer told Plaintiff that he "would be dead already" if something had burst in his stomach and made him leave without attempting to treat him. [168] at 17.

The Court concludes that the evidence as to Dr. Schaefer is sufficient for Plaintiff's Eighth Amendment claim to survive summary judgment. Taking the facts in the light most favorable to Plaintiff, a jury could conclude Dr. Shaefer knew based on Plaintiff's complaints of severe pain that he suffered from a serious medical condition, yet disregarded the risk to Plaintiff's health by "ignor[ing] [his] request for medical assistance." *Petties*, 836 F.3d at 729. Perhaps a jury may conclude that it was unreasonable to expect Dr. Schaefer to drop everything during the chronic care clinic to treat Plaintiff for a condition that was unrelated to the clinic, but the Court cannot say as a matter of law that Dr. Schaefer's refusal to do so did not constitute deliberate indifference. Dr. Schaefer is, however, entitled to summary judgment on Plaintiff's First Amendment retaliation claim, because Plaintiff has presented no evidence that Dr. Schaefer knew about Plaintiff's earlier lawsuit or grievances against Wexford when he denied Plaintiff's request for medical treatment.

### 10. Wexford

In Count II of his amended complaint, Plaintiff alleges that Wexford maintained a policy or procedure under which inmates with serious medical conditions, like Plaintiff, were routinely denied timely access to proper or sufficient medical care, were forced to make additional visits and were forced to pay $5 to repeatedly see doctors who would not address their medical needs. Plaintiff alleges that this policy or procedure resulted in the consistent failure and refusal of its employees to provide proper or adequate medication and medical care to Plaintiff. The Wexford Defendants move for summary judgment on Plaintiff's claim against Wexford on the basis that (1) the doctrine of *respondeat superior* does not apply to Section 1983 actions; and (2) the undisputed facts do not support holding Wexford liable for the constitutional violations of its

employees under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

The Court agrees that Wexford cannot be held liable for its employees' alleged deliberate indifference based on *respondeat superior*. Plaintiff argues that *respondeat superior* should apply because there is evidence that Wexford structured its affairs so no one person was responsible for Plaintiff's care. In support, Plaintiff cites Justice Breyer's dissent in *Board of County Commissioners v. Brown*, 520 U.S. 397, 430-37 (1997), and the Seventh Circuit's statement in *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014), that "a new approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983." However, as *Shields* expressly recognizes, the "controlling precedents of this court [are] clear" that "a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself," and "[r]*espondeat superior* liability does not apply to private corporations under § 1983." *Id.* at 789; see also *Delgado v. Ghosh*, 2016 WL 316845, at *5 (N.D. Ill. Jan. 27, 2016) (same; discussing *Shields*); *Aku v. Chicago Bd. of Ed.*, 2017 WL 5451808, at *7 (N.D. Ill. Nov. 14, 2017). This Court is required to follow Seventh Circuit precedent. Therefore, Plaintiff cannot sue Wexford on a *respondeat superior* theory of liability, and is limited to proceeding under *Monell*.

"The critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). This can be shown with evidence "an official policy," a "decision by a final decisionmaker," or a "custom." *Id.* Plaintiff argues that Wexford is liable under *Monell* because

it has an unwritten policy of refusing to enroll inmates with non-specific chronic conditions in the general medicine chronic care clinic. According to Plaintiff, the fact that Plaintiff lived in three different IDOC facilities, complained of persistent symptoms in all three facilities, yet was never enrolled in the general medicine chronic care clinic, is sufficient evidence to survive summary judgment on his *Monell* claim. Plaintiff also contends that the mere existence of a general medicine chronic care clinic at IDOC facilities is not enough to absolve Wexford of liability when the evidence shows "a pattern and practice of not enrolling inmates in the clinic, presumably so that Wexford can continue to collect (or help its contractual partner collect) the $5 copay for nonchronic clinic health care unit appointments." [168] at 28. According to Plaintiff, "recent case law from the Seventh Circuit demonstrates that a correctional facility's failure to provide continuity of care to a single inmate can provide the basis for *Monell* liability." *Id*. at 29 (quoting *Glisson*, 849 F.3d at 381 ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?")). Plaintiff's *Monell* theory assumes that Plaintiff would have received better care if he was enrolled in the chronic care clinic, because then he would have been seen consistently by the same doctor, who was familiar with his medical history and could track his condition.

Wexford responds that there is insufficient evidence of a policy or practice of denying inmates with non-specific chronic conditions enrollment in the general medicine chronic care clinic. The Court agrees. Where the alleged constitutional deprivation resulted from an implicit policy, a plaintiff must present evidence of a widespread practice, not simply an isolated event. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). The only evidence Plaintiff offers is that he was not enrolled in the general medicine chronic care clinic for his ongoing complaints of

abdominal pain, which is insufficient evidence of a custom. See *id.* at 773-74 (pretrial detainee did not show that alleged practice at county jail of dispensing an inmate's entire drug prescription at one time was widespread practice reflective of policy choice made by county sheriff, where he did not witness such disbursements to other inmates, had no evidence concerning the frequency of the claimed practice, and had evidence only of his personal experience of being given his full prescription on four occasions); *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1073-75 (N.D. Ill. 2016) (disabled inmate housed at county corrections hospital failed to establish that housing disabled inmates in inaccessible housing units was widespread custom or practice of county or county sheriff, where he had no evidence of the number of disabled inmates at hospital or in county jail, no evidence that other inmates were routinely subjected to the same treatment, did not supply data about the availability and occupancy of ADA-compliant cells, and relied only on allegations pertaining to her own experience).

The Seventh Circuit's recent *en banc* decision in *Glisson* does not change the Court's conclusion. In that case, the plaintiff, an inmate in the custody of the Indiana Department of Corrections, had a long history of serious medical problems that pre-dated his confinement, including laryngeal cancer. *Glisson*, 849 F.3d at 374. Thirty-seven days after entering custody, he died of complications from laryngeal cancer and contributory chronic renal disease. *Id.* at 378, 382. The plaintiff's estate brought a *Monell* deliberate indifference claim against the Indiana Department of Corrections' medical provider, Corizon. The *en banc* majority held that summary judgment was precluded by genuine issues of material fact concerning whether Corizon's policymakers were deliberately indifferent by failing to adopt protocols for the coordinated care of chronic illnesses such as Glisson's. The majority determined that there was evidence from which a jury could conclude that "Corizon had actual knowledge that, without

protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless 'adopt[ed] a policy of inaction.'" *Glisson*, 849 F.3d at 382 (quoting *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012)). This evidence included Corizon's decision not to follow the Indiana Department of Correction's guidelines, which mandated a treatment plan for chronic cases. *Id.* at 380. The majority further held that a jury could conclude that "the absence of protocols caused [the inmate's] death." *Id.* at 382.

In this case, in contrast to *Glisson*, there is no evidence that Wexford consciously chose as a matter of policy (either written or unwritten) not to enroll inmates with non-specific chronic conditions in its general medicine chronic care clinic. The only evidence of *Wexford's policy*— as opposed to the choices of Plaintiff's individual treatment providers—is that Wexford has a general medicine chronic care clinic. Plaintiff's supposition that Wexford wanted to help IDOC collect $5 co-pays is nothing more than speculation. There is no evidence Wexford had any agreement to help IDOC collect $5 co-pays or incentive to do so. This stands in sharp contrast to *Glisson*, in which Corizon departed from Indiana Department of Corrections guidelines by failing to adopt any policy for coordinated medical treatment.

Further, unlike in *Glisson*, there is no evidence that Wexford's alleged custom resulted in the violation of Plaintiff's Eighth Amendment rights. All of Plaintiff's medical treaters had access to his records and could see the notes of other physicians who treated him. For instance, Plaintiff complains that many of the individual Wexford Defendants were deliberately indifferent because they saw but did not act on Dr. Carson's note that he potentially suffered from IBS, and that most of them also saw the subpoena that he claims was in his medical file. Further, even if Plaintiff had been enrolled in the general medicine chronic care clinic, there is no evidence that

he would have seen the same medical provider or providers throughout his treatment. Nor is there any evidence that the clinic uses the same doctors or other medical professionals at each session of the clinic. And Plaintiff was moved to three difference IDOC facilities, which all had different medical professionals. Wexford had no control over IDOC's decisions to move Plaintiff. For these reasons, the Court concludes that Wexford is entitled to summary judgment on Plaintiff's *Monell* claim.

### B.    IDOC Medical Personnel

Plaintiff brings deliberate indifference claims against IDOC medical personnel and against prison officials and guards.[1] The Court begins its analysis with the medical personnel, since they are governed by the same legal standards as the Wexford Defendants addressed above.

### 1.    Nurse Eggemeyer

Defendant Eggemeyer, a correctional nurse at Menard, interacted with Plaintiff on one occasion. The Wexford Defendants argue that Eggemeyer is entitled to summary judgment because the undisputed evidence shows that he was not deliberately indifferent to Plaintiff's complaints of abdominal pain and related symptoms. According to the IDOC Defendants, Eggemeyer examined Plaintiff by taking his temperature and blood pressure, provided him with Maalox, and referred him to a physician for further treatment. The Wexford Defendants also point out that, as a nurse, Eggemeyer did not have any independent authority to dispense pain medication to Plaintiff.

Plaintiff argues that Eggemeyer is not entitled to summary judgement because he made no effort to treat his complaints of pain, and instead gave him tablets that were meant to treat

---

[1] Although Plaintiff's amended complaint is unclear about which Defendants are also being sued for retaliation in violation of the First Amendment, he does not assert in response to summary judgment that the IDOC Defendants have violated his rights under the First Amendment. Therefore, the IDOC Defendants are entitled to summary judgment in their favor to the extent that the First Amendment retaliation claim has been brought against them.

acid reflux. Plaintiff also asserts that Eggemeyer "conditioned [Plaintiff's] ability to see a doctor on his payment of a $5.00 copay," and when Plaintiff "informed … Eggemeyer that he couldn't afford to pay the $5.00, … Eggemeyer took no further action to ensure that [Plaintiff] get treatment for his abdominal pain." [168] at 15-16. In addition, Plaintiff disputes that Eggemeyer could not dispense pain medication.

The Court concludes that Eggemeyer is entitled to summary judgment on Plaintiff's deliberate indifference claim. The undisputed evidence shows that Eggemeyer responded to Plaintiff's complaints of abdominal pain and related symptoms by examining him and offering him Maalox. The evidence does not show that Eggemeyer thought that this would exacerbate Plaintiff's condition and there is no evidence that Eggemeyer could have done anything more, on his own, to alleviate Plaintiff's symptoms. While Plaintiff disputes that Eggemeyer could not dispense pain medication without authorization from a doctor, Eggemeyer testified that he could not and Wexford's nursing protocols, while not expressly forbidding the dispensation of pain medication, do not list pain medication as a nursing intervention for either indigestion/heartburn or stomach ache/abdominal pain. [163] at 68, 85. Instead, the nursing protocols call for the use of Maalox/Mylanta, *id.*, which is what Eggemeyer gave Plaintiff.

Given his own treatment limitations, Eggemeyer offered to refer Plaintiff to a doctor. Plaintiff claims in his brief that Eggemeyer conditioned the referral on Plaintiff paying a $5.00 co-pay, which he could not afford, but Plaintiff's LR 56.1 statement does not support his claim of poverty. Instead, Plaintiff states that "Eggemeyer asked [Plaintiff] to sign a $5.00 money voucher in order to see Dr. Shearing," but Plaintiff "told … Eggemeyer that he did not want to pay to see Dr. Shearing because the last time he saw Dr. Shearing he was thrown out of his office without any treatment for the pain." [159] at 17. It was therefore Plaintiff's choice, not

Eggemeyer's alleged indifference, that resulted in Plaintiff not being referred to a doctor. For these reasons, Eggemeyer is entitled to summary judgment.

### 2. Dr. Shicker

Dr. Shicker was IDOC's medical director during the period when the events Plaintiff complains of occurred. Plaintiff sent Dr. Shicker three letters between September 2011 and July 2013 in which, according to Plaintiff, he stated that he was experiencing extreme pain, gas, and rectal bleeding and not receiving medical treatment. [159] at 21. The IDOC Defendants argue that Dr. Shicker is entitled to summary judgment because he repeatedly investigated Plaintiff's claims of inadequate healthcare by speaking with or emailing Plaintiff's medical providers and responded to Plaintiff's letters.

The Court agrees that the evidence viewed in the light most favorable to Plaintiff is insufficient to support a deliberate indifference claim against Dr. Shicker. Dr. Shicker communicated with Plaintiff's medical providers on multiple occasions about Plaintiff's examinations, test results, and treatment and responded to Plaintiff's letters. Plaintiff argues that Dr. Shicker's reliance on reports from Plaintiff's treatment providers does not absolve him of liability because, "[w]hile prison officials may rely on medical professionals, they may not do so where they have personal knowledge via repeated complaints from the prisoner that the medical professionals' reports were not accurate." [168] at 16. However, Plaintiff does not point to any particular inaccuracies in the medical professionals' reports or to which Plaintiff alerted Dr. Shicker. Plaintiff also claims more generally that his letters informed Dr. Shicker that he was not being treated. See [159] at 21. However, as Dr. Shicker's investigation revealed, Plaintiff was, in fact, receiving treatment; Plaintiff's disagreement was with whether the treatment was appropriate and effective. Further, Plaintiff does not argue that he told Dr. Shicker that he kept

being prescribed laxatives even though they were making his pain worse, which distinguishes Dr. Shicker from most of the Wexford Defendants discussed above. For these reasons, the Court concludes that Dr. Shicker is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### C. IDOC Prison Personnel

The Court now turns to the IDOC non-medical personnel who have been named Defendants in this action. In *Petties*, the Seventh Circuit explained that the most obvious example of deliberate indifference "is a prison official's decision to ignore a request for medical assistance." 836 F.3d at 729. Beyond this, non-medical prison personnel generally are "entitled to rely" on the judgment of medical professionals, *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013); see also *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)), so long as they "investigate[] the complaints and refer[] them to the medical providers who could be expected to address the [inmate's] concerns." *Greeno*, 414 F.3d at 656. "'The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *McGee*, 721 F.3d at 483 (quoting *King*, 680 F.3d at 1018).

Further, although "non-medical personnel not directly involved in an inmate's medical care are usually not liable for their review and/or denial of medical grievances," *Dobbey v. Randle*, 2015 WL 5245003, at *9 (N.D. Ill. Aug. 26, 2015) (citing *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012)), "[a]n inmate's correspondence to a prison administrator may … establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez*, 792 F.3d at 781-82 (citing *Vance v.*

*Peters*, 97 F.3d 987, 993 (7th Cir. 1996)).  "The plaintiff must demonstrate that 'the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'"  *Arnett*, 658 F.3d at 755–56 (quoting *Vance*, 97 F.3d at 993).

With these standards in mind, the Court turns to the individual non-medical IDOC Defendants.

### 1.    Warden Hardy

Hardy was the Warden of Stateville during the period relevant to Plaintiff's deliberate indifference claim.  Plaintiff sent ten grievances to the Warden's office.  The IDOC Defendants argue that Hardy is entitled to summary judgment on Plaintiff's claim because his handling of communications from Hardy was constitutionally sufficient.  They explain that Hardy deemed the first grievance an emergency and then properly delegated follow-up and Plaintiff's subsequent nine grievances to a designee.  Plaintiff responds that, at the very least, a genuine dispute of material fact exists as to whether Hardy was deliberately indifferent to Plaintiff's severe abdominal pain when (1) he failed to ensure that Plaintiff saw a physician after deeming his condition an emergency and (2) he failed to review any subsequent grievances from Plaintiff stating that he had still not seen a doctor.

The Court concludes that Hardy is entitled to summary judgment.  It is undisputed that he deemed Plaintiff's first grievance an emergency.  It is also undisputed that Hardy's policy was to delegate the follow-up to his designee.  While Hardy did not specifically recall whether he did that in Plaintiff's case, his testimony on his general policy is not genuinely disputed.  Further, there is evidence that the designee handled Plaintiff's subsequent nine grievances, providing circumstantial evidence that the handling of Plaintiff's medical complaints had been delegated to

Hardy's designee. For purposes of a deliberate indifference claim, the Seventh Circuit and district courts have held that a warden is entitled to delegate the review of grievances to a designee. See *Thomas v. Knight*, 196 F. App'x 424, 429 (7th Cir. 2006) (affirming summary judgment in favor of superintendent where designee reviewed grievance); *Stallings v. Hardy*, 2013 WL 5781805, at *9 (N.D. Ill. Oct. 25, 2013) (granting summary judgment in favor of warden who lacked knowledge of Plaintiff's grievances where warden's designee, "as allowed by policy," reviewed the grievances); *Kelly v. Ghosh*, 2013 WL 773012, at *9 (N.D. Ill. Feb. 27, 2013) (granting summary judgment in favor of warden where warden did not review emergency grievance but rather delegated to designee). To the extent that Hardy's designees mishandled Plaintiff's grievances, Hardy's "mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient" to sustain a claim against him for deliberate indifference. *Arnett*, 658 F.3d at 755.

Plaintiff asserts that the Illinois Administrative Code does not allow Defendant Hardy to designate the handling of emergency grievances. In particular, Plaintiff argues that "the applicable correctional regulations required that Defendant Hardy, as the Chief Administrative Officer, upon deeming a grievance an emergency, 'expedite processing of the grievance and respond to the offender,'" [168] at 6 (quoting 20 Ill. Admin. Code 504.840(b)), and under the code "this responsibility for reviewing and addressing emergency grievances cannot be delegated on a routine basis." *Id.* (quoting 20 Ill. Admin. Code 504.805(b)). However, the code provision prohibiting delegation does not apply to the code provision that requires expedition of a grievance that has been deemed an emergency, because that provision does not "*specifically state*[] [that] the Director or Chief Administrative Officer shall *personally* perform [that] dut[y]." 20 Ill. Adm. Code 504.805(b) (emphasis added); see also 20 Ill. Admin. Code 504.840(b)

(providing that "[i]f the Chief Administrative Officer determines that the grievance shall be handled on an emergency basis, he or she shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken"); *Robinson v. Pfister*, 2017 WL 2882690, at *2 (C.D. Ill. July 6, 2017) ("Plaintiff also contends that Defendant Pfister cannot delegate the responsibility for reviewing emergency grievances.   Plaintiff is incorrect. 20 Ill. Admin. Code 504.805(a) allows delegation unless a subpart 'specifically states that the ... Chief Administrative Officer shall personally perform the duties.'   The procedures for emergency grievances do not specifically state that the Warden must personally review those grievances."); *Couch v. Godinez*, 2014 WL 7048464, at *5 (S.D. Ill. Dec. 12, 2014) ("The [Illinois Administrative] [C]ode does not state that the director must personally review grievances or that the Administrative Review Board cannot perform this routine function.").

For these reasons, the Court concludes that Hardy is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### 2.    Correctional Officer Whitfield

Whitfield was a correctional officer at Stateville during the time period relevant to Plaintiff's deliberate indifference claim.   His only interaction with Plaintiff was on September 22, 2011.   According to Plaintiff, Whitfield gave him a pass to the HCU, but later that day ignored Plaintiff's two requests to be allowed to visit the HCU.

The IDOC Defendants argue that Whitfield is entitled to summary judgment because Plaintiff's deliberate indifference claim against him is barred by the applicable two-year statute of limitations.   They explain that the cause of action against Whitfield accrued, at the very latest, when Plaintiff was allowed to see a doctor in December 2011.   Plaintiff responds that his claim

against Whitfield did not accrue until, at the earliest, July 2012, when Plaintiff was transferred out of Stateville. Therefore, according to Plaintiff, he timely filed his complaint in April 2014.

The Court concludes that Whitfield is entitled to summary judgment based on the statute of limitations. As both parties recognize, a two-year statute of limitations applies to Plaintiff's Section 1983 claims. See *Kalimara v. Illinois Dep't of Corr.*, 879 F.2d 276, 276-77 (7th Cir. 1989) (holding that Illinois' two-year statute of limitations, which applies generally to actions for damages for injury to the person, as well as to several listed intentional torts, applies to § 1983 actions brought in Illinois). "Deliberate indifference to a serious medical need is a continuing violation that accrues when the defendant has notice of the untreated condition," and typically "ends only when treatment is provided or the inmate is released." *Jervis v. Mitcheff*, 258 F. App'x 3, *5-6 (7th Cir. 2007). For continuing violations, "the two-year period starts to run (that is, the cause of action accrues) from the date of the last incidence of that violation, not the first." *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). This allows a plaintiff to "'reach back' to the beginning of the wrong, 'even if that beginning lies outside the statutory limitations period.'" *Watkins v. Ghosh*, 2011 WL 5981006, at *3 (N.D. Ill. Nov. 28, 2011) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)).

The Court recognized in its opinion denying Hardy's motion to dismiss on statute of limitations grounds that "[a] plaintiff's claim that defendants refused to treat his condition is deemed to have 'continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail.'" *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1016 (N.D. Ill. 2015) (citing *Heard*, 253 F.3d at 318); *Wilson v. Groze*, 800 F. Supp. 2d 949, 955 (N.D. Ill. 2011)). However, in this case, Plaintiff was provided with medical treatment by Dr. Carter in December 2011. There is no evidence that Whitfield—a correctional officer, *not* a

warden or other supervisory employee like Hardy—had any power to do anything about Plaintiff's medical condition beyond letting Plaintiff use his pass for the HCU when Plaintiff requested on September 22, 2011. Significantly, there are no allegations that Whitfield knew that (in Plaintiff's view) Dr. Carter failed to treat or mistreated him at his December 2011 appointment. Indeed, it is undisputed that Whitfield had no further interaction with Plaintiff. Not surprisingly, then, Plaintiff never explains what more Whitfield could or should have done after Plaintiff was allowed to see Dr. Carter, and provides no evidence that Whitfield could have done anything. See *Wilson*, 800 F. Supp. 2d at 955 ("an Eighth Amendment violation arising out of a defendant's deliberate indifference to a prisoner's serious medical needs is a continuing violation, and thus can accrue for as long as a defendant knows about a prisoner's serious medical condition, has the power to provide treatment, and yet withholds treatment"). Whitfield, as a corrections officer, obviously had no authority to overrule Dr. Carter's treatment decisions.

Thus, to the extent that Plaintiff's claim against Whitfield was tolled at all, tolling ended when Plaintiff was allowed to see Dr. Carter in December 2011. The statute of limitations on Plaintiff's deliberate indifference claim against Whitfield therefore expired at least six months prior to the filing of the initial complaint in this case and Defendant Whitfield is entitled to summary judgment on Plaintiff's untimely claim.

### 4. Warden Harrington

Harrington was the Warden of Menard at the time relevant to Plaintiff's deliberate indifference claim. Plaintiff maintains that he told Harrington in person in March or April 2013 that he was in extreme pain and Harrington did nothing, but Harrington had no recollection of this taking place. Plaintiff also maintains that he sent a number of letters to Harrington asking for help, but that Harrington did not respond; Harrington did not recall receiving any letters from

Plaintiff. Plaintiff further asserts that he sent multiple grievances to Harrington between March and December 2013. Harrington determined that Plaintiff's December 12, 2013 grievance was an emergency and sent Plaintiff to Dr. Fuentez to be treated.

Defendants argue that Harrington is entitled to summary judgment because there is no evidence that he received Plaintiff's letters and because he appropriately responded to Plaintiff's December 12, 2013 grievance by deeming it an emergency and sending him to Dr. Fuentez to be treated. Defendants also argue that, "[g]iven the extensive medical treatment that was provided to Plaintiff" in 2012 and 2013, Harrington (along with the other IDOC non-medical personnel who interacted with him during this period) "was being treated properly." [142-2] at 7.

Plaintiff responds that Harrington is not entitled to summary judgment because he ignored numerous letters and three emergency grievances filed by Plaintiff over an eight-month period, before finally responding to Plaintiff's fourth grievance in December 2013.

Neither party discusses the record in sufficient detail for the Court to determine from the briefs whether Harrington had sufficient knowledge of Plaintiff's medical condition and alleged lack of medical treatment to be held liable for deliberate indifference. The Court therefore independently reviewed the transcript of Harrington's deposition [142-10] for discussion of Plaintiff's letters and grievances. Harrington testified that he did not recall receiving any grievances or letters from Plaintiff. The transcript indicates that Plaintiff's April 21, June 6, and June 13, 2013 grievances were received by the Warden's office and denied. However, Harrington testified that the April 21 and June 13 grievances were signed not by him, but by an assistant warden who had the power to sign his name. Harrington admits to signing the June 6 grievance, in which Plaintiff complained of severe abdominal pain, severe lower back pain, and overwhelming gas and that Nwaobasi was hostile toward him and told him his medical problems

were in his head.  Harrington testified that he did not recall what happened with the grievance but was "sure [he] contacted the Assistant Warden of Programs, who would have contacted someone in the medical field to get an answer for [him]," because "[t]hat's the way [he] treat[s] every grievance."  [142-10] at 44.  The evidence is essentially the same as the evidence concerning Hardy's handling of Plaintiff's grievances, and the Court's analysis is also the same. Harrington's designee reviewed the April 21 and June 13 grievances, and therefore there is no evidence that Harrington had knowledge of the complaints set out in those grievances.  While Harrington saw and signed the June 6 grievance, his policy was to delegate follow-up of all such grievances to his assistant warden.  Harrington was allowed to designate these tasks to his assistant wardens.  Without any evidence that Harrington knew that his assistant wardens were failing to perform their designated duties, Harrington cannot be held liable for deliberate indifference.

### 5.    Warden Pfister

Pfister was the Warden of Pontiac during the time period at issue in Plaintiff's deliberate indifference claim.  The IDOC Defendants argue that Pfister is entitled to summary judgment because Pfister did not see or personally review any of Plaintiff's grievances.  They also argue that given the extensive medical treatment that was provided to Plaintiff in 2012 and 2013, Pfister was entitled to believe that Plaintiff was being treated properly.

Plaintiff responds that Pfister was deliberately indifferent to Plaintiff because he knew of Plaintiff's serious medical condition but did nothing to address it.  In particular, Plaintiff asserts that Pfister "knew that [Plaintiff] was in pain because he received and responded to at least one of [Plaintiff's] emergency grievances."  [168] at 8.  As support, Plaintiff cites to his own deposition transcript.  But this does not show that Pfister personally responded to Plaintiff's

grievance.  And Pfister's testimony, which Plaintiff does not address, is that he never personally reviewed emergency grievances, but instead all grievances at Pontiac went to the Correctional Counselor, and emergency grievances were then handed to Administrative Assistant 3, who at the time was either Chris Melvin or Marshall Ramirez.  [142-8] at 13-14.

Plaintiff also argues that Pfister knew of Plaintiff's serious medical condition because Plaintiff told him about it in person, yet Pfister took no action to refer him to a doctor or specialist.  The Court agrees that the evidence of this personal interaction is sufficient for Plaintiff to withstand summary judgment on his deliberate indifference claim against Pfister. Plaintiff testified that on January 10, 2013, he saw Pfister in the correctional facility and "again told them about [his] medical treatment," but Pfister yelled at him that he would get to the grievances when he got to them, and he was not given any medical treatment before he was transferred out of Pontiac.  [142-4] at 105-106.  The IDOC Defendants' only response to this evidence is that Plaintiff does not know whether Pfister performed any follow-up on his care. However, it is undisputed that Plaintiff did not receive any medical treatment before he was transferred out of Pontiac, or interact with Pfister again in person or writing, from which a jury could infer that Pfister did not do anything to follow up on Plaintiff's in-person complaints.

### 6.    Assistant Warden Reed

Reed was the Assistant Warden of Programs at Pontiac between the Spring of 2010 and July 2013.  The IDOC Defendants argue that to the extent that Reed may have received a letter from Plaintiff on October 12, 2012 complaining that he was not receiving treatment, Reed responded appropriately by immediately putting Plaintiff in to be seen at the HCU, where he was admitted two days later and seen by Dr. Tilden.

Plaintiff argues that Reed's response was constitutionally insufficient because, although he had Plaintiff admitted to the hospital on an emergency basis, he took no further action to ensure that Plaintiff received adequate medical attention. Plaintiff asserts that following his admission to the hospital, "when Defendant Reed was made aware that [Plaintiff] was still not given any treatment for his abdominal pain, he failed to do anything to help him." [168] at 7.

The Court concludes that although Reed's response to Plaintiff's October 12 complaint was adequate, there are material questions of fact concerning his January 1 and January 10, 2013 interactions with Plaintiff that require denial of summary judgment as to the claims against Reed. According to Plaintiff's testimony, he told Reed on January 1, 2013 that he was still not receiving any treatment for his pain, but Reed did nothing but tell him that he would get treatment after he was transferred to a different correctional facility. Plaintiff also testified that Reed walked away on January 10, 2013 when he was telling Pfister and Reed that he had severe abdominal pain. Plaintiff's version of the facts suggest that Reed "ignore[d] [his] request for medical assistance," *Petties*, 836 F.3d at 729, and failed to "investigate[] the complaints and refer[] them to the medical providers who could be expected to address the [inmate's] concerns." *Greeno*, 414 F.3d at 656.

## IV. Conclusion

For these reasons, Plaintiff's motion for leave to file a surreply [177] is granted. The Wexford Defendants' motion for summary judgment [139] is granted in part and denied in part. Summary judgment is granted in favor of Dr. Ghosh, Dr. Fuentez, and Wexford and against Plaintiff on Plaintiff's Eighth Amendment deliberate indifference and First Amendment retaliation claims, and for Dr. Schaefer and against Plaintiff on Plaintiff's First Amendment retaliation claim. Summary judgment is denied as to the Eighth Amendment and First

Amendment claims against Williams, Dr. Carter, Dr. Tilden, Ojelade, Dr. Nwaobasi, and Dr. Shearing, and as to the Eighth Amendment claim against Dr. Schaefer. The IDOC Defendants' motion for summary judgment [142] is granted in part and denied in part. Summary judgment is granted in favor of all IDOC Defendants and against Plaintiff on Plaintiff's First Amendment claim and in favor of Hardy, Whitfield, and Harrington and against Plaintiff on Plaintiff's Eighth Amendment claim. Summary judgment is denied as to the Eighth Amendment claim against Defendants Pfister and Reed. This case is set for status hearing on April 19, 2018 at 9:30 a.m.

Dated: March 26, 2018

_____
Robert M. Dow, Jr.
United States District Judge